Filed 5/27/16  A.G. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| A.G.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>    Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>    Real Party in Interest. | F073268<br><br>(Stanislaus Super. Ct. No. 517042)<br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Nadine Salim for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Robin Gozzo, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before, Detjen, Acting P.J., Franson, J. and Smith, J.

A.G. (father), seeks extraordinary writ relief from the juvenile court's orders issued at a contested 18-month review hearing (Welf. & Inst. Code, § 366.22)[1] terminating his reunification services and setting a section 366.26 hearing as to his 23-month-old daughter Selena. He contends the juvenile court erred in finding he was provided reasonable reunification services. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

Selena was taken into protective custody at birth in June 2014, while her parents, father and Stephanie (mother), were attempting to reunify with Selena's then 22-month-old twin siblings, Alexa and V.G. Alexa and V.G. had been taken into protective custody the previous November by the Stanislaus County Community Services Agency (agency) after the police responded to a report of an unconscious child. Then 16-month-old Alexa appeared to have sustained a head trauma and to be having a seizure. She also had a facial burn. Mother initially stated that she left the twins in the bathtub briefly and, while she was gone, V.G. turned on the hot water and burned Alexa. Mother subsequently admitted deliberately burning her and was convicted of child cruelty. Father lived with mother and the children at the time and acknowledged that mother was abusive to Alexa and that he had seen Alexa with unexplained injuries. The juvenile court adjudged the twins its dependents and ordered reunification services for father and mother. The agency placed Selena with her siblings in the home of Mr. and Mrs. D.

The agency filed a dependency petition on Selena's behalf, alleging that Selena was at a substantial risk of suffering serious physical harm in father and mother's custody in light of mother's physical abuse of Alexa, father's failure to protect Alexa, and their failure to complete their court-ordered services. By that time, they had both completed inpatient drug treatment and were living in separate sober living facilities. Father was

---

**1** All statutory references are to the Welfare and Institutions Code.

living in Dad's House and claimed six months of sobriety.  Father and mother were also participating in parenting and domestic violence programs.  However, the agency was concerned that mother still struggled to control her anger and that father had not yet learned to be protective.  The agency believed that Selena could be seriously injured if placed in their care.

In September 2014, following a contested dispositional hearing, the juvenile court ordered Selena removed from father and mother's custody and ordered reunification services for them.  On that same date, the juvenile court terminated their reunification services as to the twins and set a section 366.26 hearing.[2]

In December 2014, the agency filed its report for the six-month review hearing and recommended the juvenile court terminate mother's and father's reunification services.  Though father and mother had maintained their sobriety, neither had made significant progress toward demonstrating the ability to safely parent Selena.  Mother continued to exhibit anger reflective of an abuser and father denied that mother abused Alexa.  Father's therapist was concerned about his ability to be assertive and protective "in an impromptu or pressured situation."  Father had graduated from Dad's House and moved in with his sister-in-law.

In January 2015, following a contested six-month review hearing, the juvenile court terminated mother's reunification services as to Selena but continued services for father.[3]  The court also ordered the agency to file a revised case plan.  The new case plan required father to obtain the resources to meet Selena's needs, provide her a safe home and monitor her health, safety and well-being.  The goal was for father to enter Nirvana's

[2]     Father and mother challenged the juvenile court's setting hearing by extraordinary writ petition, which we denied.  (F070157)

[3]     We affirmed the juvenile court's order terminating mother's reunification services.  (*In re Selena G.* (Sept. 28, 2015, F071052) [nonpub. opn.].)

Dad's House when available and begin two overnight visits a month. Father was prohibited from allowing mother access to Selena.

After mother's services were terminated, the agency shifted its focus to preparing father to assume custody of Selena. The agency wanted father to become independent. However, he was disadvantaged in a number of ways. He had a criminal record as well as a record of welfare fraud, an eviction notice, and unpaid utility bills and restitution fines. In addition, he had a suspended driver's license. These circumstances made it difficult for father to secure employment and a residence and reunify with Selena.

In early March 2015, father moved into Dad's House. Approximately a week later, the agency arranged visits for him there and in the community with the assistance of a parent mentor, Maricela Rodriguez. In early April 2015, father began working the graveyard shift at a recycling center. Ms. Rodriguez worked with him to have overnight visits with Selena and, by the end of April, he was having them. However, the agency terminated overnight visits three weeks later after father delayed getting medical treatment for Selena. Selena's doctor had diagnosed her with an ear infection and prescribed an antibiotic. Father had Selena on an overnight visit while she was sick and Selena broke out in a rash. Father had reason to suspect that Selena's rash was an allergic reaction to the antibiotic but did not call Mrs. D. or Selena's doctor. When Mrs. D. saw Selena's rash, she telephoned the doctor's office and was told to discontinue the antibiotic. She was also told that Selena could have gone into anaphylactic shock and died. By the time Mrs. D. saw Selena's rash, it covered Selena's body. The rash disappeared after Mrs. D. discontinued the antibiotic. Father explained that he did not call anyone for help because it was late and he did not like calling Mrs. D.

In June 2015, the agency filed its report for the 12-month review hearing. The agency recommended the juvenile court terminate father's reunification services and set a section 366.26 hearing to implement a permanent plan of adoption. The agency reported

4

that father had maintained his sobriety and participated in his services with good attendance. He had obtained temporary employment and was hoping to find a permanent position. He shared, however, that it was not easy to find employment with a criminal record and without a driver's license. The agency also reported that father was a likeable person who loved Selena but that he refused to ask for any assistance in caring for her, despite repeated prompting. For example, Mrs. D. purchased a cell phone for him so that he could have 24-hour-a-day access to her but he did not use it. Nor did he follow the directions offered by the parent mentor for fear of " 'looking bad.' " As a result, he placed Selena at risk of injury or death. The agency did not believe father had made sufficient progress to warrant continuing reunification services.

In July 2015, father began working a full-time graveyard shift at a sanitation company. He told the social worker, Pamela Werb, that the job was a permanent job and that he would be able to take care of Selena. He would be on probation for 90 days and then would request a daytime shift. Believing that father's graveyard shift was temporary, Werb authorized trial visits and Mr. and Mrs. D. agreed to take care of Selena at night. As they were no longer eligible to receive funding as foster care parents, father agreed to pay them $75 a week.

On August 25, 2015, the juvenile court conducted the 12-month review hearing and continued father's reunification services to the 18-month review hearing which the court set for November 30, 2015. The court ordered the agency to file an amended case plan. Father's amended case plan required him to remain at Dad's House and begin looking for appropriate housing. His amended case plan also required him to arrange appropriate child care and supervision for Selena while he was away from home. On September 1, 2015, father began a trial visit with Selena.

The agency authorized Ms. Rodriguez to assist father in finding housing.

5

Ms. Rodriguez informed Werb in early September 2015 that father had several thousand dollars in outstanding utility bills and needed help paying them. She did not believe he would be able to move out on his own without assistance. Werb told her that he was working and had built up a savings and needed to be responsible for his past due bills. Rodriguez also told Werb that father did not have transportation and was trying to get his driver's license back, which would also require him to pay. She said that he was working well with Mrs. D. to do what was best for Selena. She said he had paid Mrs. D. for child care for the month of September.

On September 23, 2015, Rodriguez informed Werb that father was paying his outstanding restitution and needed assistance with his outstanding bills. She said she found a one-bedroom, one-bathroom residence in Ceres but she wondered how he could afford it with all his outstanding bills. She asked if the agency would pay the first month deposit and any other expense the landlord wanted so he could move in. Werb suggested father try to locate a two-bedroom residence while he had the agency to help him with the deposit and first month's rent.

On September 25, 2015, father told Werb that his job was ending at the end of October 2015. He explained that he misunderstood that the job was permanent. Rodriguez asked Werb how they were going to help him get housing on unemployment. She did not believe he would be able to afford a residence in Ceres on unemployment. Father subsequently viewed a residence in Ceres and did not like it because it was too small.

On October 1, 2015, Werb helped father complete an application for Section 8 housing. Werb attached it to a cover letter from the agency explaining he was in imminent danger of losing his housing. That same day, Werb met with her supervisor and was told the agency would cease paying Dad's House for father's housing at the end of October 2015. On October 2, 2015, father picked up a letter from the agency to a

6

prospective landlord in Turlock stating the agency would pay for the first month's rent and deposit.

On October 8, 2015, father's attorney filed a section 388 petition asking the juvenile court to order the agency to continue to pay while he looked for other housing. On October 12, 2015, Werb ended the trial visit.

On October 14, 2015, Werb informed the manager of Dad's House that father's trial visits had ended and asked what the repercussions were. The manager explained that a father had to have at least two overnight visits a week in order to reside at Dad's House. At that point, father had only had Selena overnight on four occasions. The manager suggested to father that he move in with his parents or obtain a studio apartment. She believed it would give father more time to " 'hit the pavement' " in terms of finding a job and a place to live.

On October 21, 2015, father told Werb that he was no longer working. She inquired and determined that he was eligible for $125 a week in unemployment. She reinstated his trial visit and told him that he needed to care for Selena himself and not rely on Mr. and Mrs. D. for child care. She told him to use the Children's Crisis Center when he needed child care.

On October 23, 2015, following a hearing, the juvenile court denied father's section 388 petition, but on its own motion amended the case plan to allow him to stay at Dad's House through November 15, 2015.

On November 6, 2015, Werb contacted father in the morning to inquire about child care. Father told Werb that he was working a temporary job from 12:30 p.m. until 9:30 p.m. and that his sister-in-law was taking care of Selena. Werb told him that his sister-in-law had not been approved to provide daycare and instructed him to take Selena to the Children's Crisis Center and to tell his sister-in-law to get fingerprinted. He agreed but did not do it. As a result, Werb tried unsuccessfully to locate Selena over the next

7

several hours by calling the Children's Crisis Center and father's sister-in-law. After lying to Werb about Selena's whereabouts, father finally admitted that Selena was with a friend named "Amy" who he met while in drug treatment. He did not know Amy's last name but gave Werb her number. He said Amy was a good person and was clean. Amy also lied to Werb when Werb asked if she had Selena and Amy refused to bring Selena to the agency until Werb threatened to call the police. Werb terminated father's trial visit and placed Selena back with Mr. and Mrs. D.

While Selena was at the agency waiting to be picked up, mother called the visitation center asking for a visit. When told that the center would contact the caregiver, she asked " 'Oh, Selena is not with [father] anymore?' " This prompted the social worker to look Amy up on Facebook. She discovered that mother was one of Amy's Facebook friends. They had lunch together on November 3, 2015, and on November 6, 2015, Amy sent mother a message stating, " '*What an emotional day*!!' "

After leaving Dad's House on November 15, 2015, father refused to give Werb his physical address. He would only give her a mailing address. He told her that he was staying "here and there." It also came to light that he was driving, though he denied it. This raised a question as to whether he was driving unlicensed with Selena.

In its report for the 18-month review hearing, the agency recommended that the juvenile court terminate father's reunification services and set a section 366.26 hearing. Though he had completed a domestic violence program and was actively engaging in therapy, the agency did not believe he had demonstrated good judgment in safely parenting Selena. According to his therapist, he tended to blame the agency for not meeting his needs. During a session in July 2015, father stated, " 'I am tired of the court people being on my back, they need to leave me alone. I'm already doing what they want me to do, my counseling, meetings, and working. I don't want to talk to anyone; I can't

8

and won't talk to [Werb].' " By that time, his parental rights to the twins had been terminated.

In February 2016, the juvenile court conducted a contested 18-month review hearing. Mother testified she met Amy in November 2013, when they were both in a recovery program. She had only communicated with Amy via Facebook once or twice in the prior six months. She saw Amy's post to her about the " 'emotional day' " but did not remember when she read it. She testified that she did not speak to father at all. The court asked her if she wanted Selena to be adopted by Mr. and Mrs. D. She said she felt "torn." She knew the twins were happy with Mrs. D. and that Mrs. D. was a good mother. She wanted what was best for Selena whether that meant being adopted by Mrs. D. or returning to father.

Father testified that he had been clean and sober for approximately two years and three months. He had been working a full-time graveyard shift since November 27, 2015, and living with his cousin and his cousin's wife ("wife") for about a month. The wife worked nearby in a daycare center.

Father explained that his decision to leave Selena with Amy was a last-minute one. He had to be at work by noon and was afraid to lose his job. He had known Amy and her husband for about a year, having met her husband at the drug treatment program. Prior to that, Amy had never cared for Selena. Father admitted it was wrong to lie to Werb about where Selena was but he had already lost custody of the twins and he was "scared" of losing custody of Selena. He acknowledged that Werb had instructed him to use the Children's Crisis Center for child care but explained that doing so created a logistical problem. The bus he rode to and from the center stopped operating at 8:00 p.m. So, after he got off of work at 9:30 p.m. and got a ride to the center, he had to walk a long distance back to Dad's House with Selena in an unsafe area. He had not asked Werb to assist him

9

with that problem. Father denied that mother was at Amy's house the day he left Selena there. He did not believe he was placing Selena at risk by leaving her with Amy.

Father conceded his only complaint with Werb was that she did not do more to help him find housing. It was his first time trying to find a place to live and he felt overwhelmed. He acknowledged that the parent mentor helped him find a residence and that he turned it down but he explained that the residence did not have a yard for Selena and was in a bad area.

Father testified he and Selena could live with his cousin and his cousin's wife would take care of Selena. He had given the wife Werb's phone number so she could be cleared to be around Selena and the wife contacted Werb. He did not know whether his cousin and the wife had been fingerprinted. He said his cousin's house was not available to him earlier because he did not ask if he could stay there. If the court returned Selena to him, he said he would follow any order of the court, including an order saying he could only leave Selena with an approved care provider.

Father further testified that his cousin had a car and helped him with transportation. He had had a car since November 2015 that he could drive if he needed to get somewhere. He continued to receive bus passes but denied it was because he did not want Werb to know he was driving. He said he also took the bus sometimes.

Father's attorney argued that the agency set father up to fail rather than provide him reasonable services to reunify. Specifically, she argued, the agency arbitrarily forced father out of Dad's House while prohibiting him from using Mr. and Mrs. D. for daycare and insisting that he have full-time employment. She argued there was no requirement that he had to be independent to reunify with Selena. She also pointed out that the agency did not argue that father placed Selena at risk of harm by allowing Amy to take care of her. She argued that father had done everything asked of him but could do nothing right in the eyes of the agency. She asked the court to place Selena with father.

10

The juvenile court found that it would be detrimental to return Selena to father's custody and that the agency provided him reasonable reunification services. The court did not rely on Amy's Facebook postings, finding they were insufficient proof that mother had contact with Selena. As far as housing, the court recognized that it was difficult to find housing in the county and that father's eviction notice made it even more difficult for him. However, the court noted that father knew that he had only so much time before he had to leave Dad's House and that the agency provided him a parent mentor to assist him. The court also understood why father would not want to live just anywhere. The court was concerned, however, that father had not pursued living with his sister-in-law and having her cleared to provide backup daycare. The court was also concerned that father lied to Werb and that he thought Amy was a safe care provider because she was in the recovery community. The court thought father exercised "very, very poor judgment" in leaving Selena with Amy also because Amy was a stranger to her. The court also noted that father's therapist still had concerns about his ability to provide adequate care for Selena. The court terminated his services and set a section 366.26 hearing.

This petition ensued.

## DISCUSSION

Father contends the agency deliberately impeded his ability to reunify with Selena by inexplicably removing housing and prearranged child care from him. Therefore, he argues the agency did not provide him reasonable reunification services and the juvenile court erred in terminating them. We disagree.

The agency has a duty to facilitate the reunification of parent and child in keeping with the objectives of the court-ordered services plan and with a view to the reunification timeframe mandated by statute. Whether the agency's efforts were reasonable depends on the circumstances of the case.

11

In this case, father had until November 2015 to reunify with Selena. That is because November 2015 marked the 18-month limitation on reunification services as provided in the governing statute. (§ 361.5, subd. (a)(3).) Though father had attained success in the "treatment" components of his services plan such as his sobriety and was actively participating in the others, he nevertheless had not demonstrated the ability to provide for Selena and safely parent her. Thus, the agency's focus was to withdraw its resources in the months between the 12- and 18-month review hearings so that father could independently parent Selena.

Contrary to father's assertion, there is no evidence that the agency sabotaged his efforts to reunify by giving him a deadline to move out of Dad's House and by forbidding him from asking Mrs. D. to provide child care. Further, these actions were not inexplicable. Father would have had to move out of Dad's House by policy since he was not having the required minimum number of overnight visits. And Werb explained to father that he could not rely on Mrs. D. if he wanted to demonstrate his independence.

Further, though the agency's requirement that father simultaneously secure employment, a residence, and child care was understandably daunting and frustrating, we cannot conclude on this record that it was unreasonable. The agency told father what he was expected to do if he wanted to reunify with Selena and he found a full-time job and a home with his cousin and his cousin's wife. Fortuitously, the wife was a child care provider by profession and, according to father, was willing to care for Selena. However, father did not vigorously pursue having his cousin and his cousin's wife cleared so that Selena could live with him there and be cared for by his cousin's wife. There was also father's sister-in-law who appeared to be available for him but he did not pursue having her cleared either. Ultimately, in our view, it was father's hesitancy to ask for help and his mistrust of the agency that prevented him from assuming his full parental responsibilities and reunifying with Selena.

12

We find no error on this record and deny the petition.

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion is final forthwith as to this court.